**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JOEL EMPLEO SILVA,

*Petitioner*,

v.

MERRICK B. GARLAND, Attorney General,

*Respondent.*

Nos. 16-70130
17-73272

Agency No.
A045-476-155

ORDER AND
OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted April 16, 2020[*]
San Francisco, California

Filed March 30, 2021

Before: Marsha S. Berzon and Sandra S. Ikuta, Circuit
Judges, and Ivan L.R. Lemelle, District Judge.[**]

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument, and the case is therefore submitted on the briefs as of April 16, 2020. *See* Fed. R. App. P. 34(a)(2).

[**] The Honorable Ivan L.R. Lemelle, United States District Judge for the Eastern District of Louisiana, sitting by designation.

Order;
Opinion by Judge Ikuta;
Concurrence by Judge Berzon

## SUMMARY[***]

### Immigration

The panel filed: 1) an order withdrawing the opinion and concurring opinion appearing at 965 F.3d 724 (9th Cir. 2020), denying the petition for rehearing en banc as moot, and providing that the parties may file petitions for rehearing and hearing en banc in response to the new opinion; 2) a new opinion denying Joel Empleo Silva's petitions for review of decisions of the Board of Immigration Appeals; and 3) a new concurring opinion. In the new opinion, the panel held that the BIA did not err in concluding that petty theft under section 484(a) of the California Penal Code is a crime involving moral turpitude, and that the BIA did not abuse its discretion in denying Silva's motion to reopen to seek asylum and related relief based on changed country conditions in the Philippines.

Based on this court's binding precedent, the panel concluded that a violation of section 484(a) constitutes a crime involving moral turpitude. In outlining the relevant background, the panel observed that the BIA did not conclusively hold that a theft offense may involve moral turpitude even if it does not require the accused to intend a

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

literally permanent taking until *Matter of Diaz-Lizarraga*, 26 I. & N. Dec. 847 (BIA 2016), and that this court subsequently concluded, in *Garcia-Martinez v. Sessions*, 886 F.3d 1291 (9th Cir. 2018), that the new rule announced in *Diaz-Lizarraga* did not apply retroactively to the petitioner in that case.

The panel first considered whether the BIA's decision in this case would be correct even if the new rule in *Diaz-Lizarraga* did not apply retroactively to Silva. Accordingly, the panel addressed whether section 484(a) was an offense involving moral turpitude under the law as it existed before *Diaz-Lizarraga*, observing that the California Supreme Court, in *People v. Avery*, 27 Cal. 4th 49 (2002), held that a person could be convicted under section 484(a) even if that person did not intend to effect a literally permanent taking of property. The panel explained that, both before and after *Avery*, this court consistently held that section 484(a) was a crime involving moral turpitude, but that the cases after *Avery* did not acknowledge that section 484(a) did not necessarily require an intent to take property permanently, and therefore would not be an offense involving moral turpitude for immigration purposes before *Diaz-Lizarraga* was decided.

Nevertheless, the panel concluded it was bound by precedent, explaining that a three-judge panel must apply binding precedent even when it is clearly wrong because (for example) it failed to recognize an intervening change in the law. The panel also explained that, because *Avery* predated cases from this court holding that section 484(a) is a crime involving moral turpitude, there was no intervening controlling decision on state law. Accordingly, the panel concluded it must hold that the BIA did not err in concluding that Silva's section 484(a) convictions made him removable

for having been convicted of two or more crimes involving moral turpitude, regardless whether *Diaz-Lizarraga* applied retroactively to Silva.

As to Silva's motion to reopen, the panel held that the BIA did not abuse its discretion in denying Silva's motion on the ground that he failed to establish prima facie eligibility for asylum and related relief based on changed country conditions. Silva sought to reopen proceedings based on his history of drug use and his fear of persecution or torture under Philippine President Rodrigo Duterte's anti-drug program. The panel noted that Silva did not contend that he suffered past persecution, and merely speculated that someone in the Philippines could report his past drug use to the government, or that he might succumb to the temptation to begin using drugs again. Because Silva failed to submit any specific evidence that such events might occur, the panel held that Silva failed to establish prima facie eligibility for relief.

Judge Berzon concurred in the majority opinion in full, but wrote separately to reiterate her view that the phrase "crime involving moral turpitude" is unconstitutionally vague.

---

## COUNSEL

Manohar Raju, Public Defender; Matt Gonzalez, Chief Attorney; Francisco Miguel Ugarte, Attorney; Office of the Public Defender, San Francisco, California; Brian P. Goldman, Orrick Herrington & Sutcliffe LLP, San Francisco, California; Jennifer M. Keighley, Orrick Herrington & Sutcliffe LLP, New York, New York; Ethan P. Fallon and

Katherine M. Kopp, Orrick Herrington & Sutcliffe LLP, Washington, D.C.; for Petitioner.

Jeffrey Bossert Clark, Acting Assistant Attorney General; John W. Blakeley, Assistant Director; Bryan S. Beier, Senior Litigation Counsel; Christina P. Greer, Trial Attorney; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

Philip L. Torrey, Supervising Attorney; Lena Melillo and Eric Noble-Marks, Law Students, Crimmigation Clinic, Harvard Law School, Cambridge, Massachusetts, for Amici Curiae Florence Immigrant & Refugee Rights Project and Immigrant Defense Project.

Jose H. Varela, Public Defender; Rachael Keast, Deputy Public Defender; Marin County Office of the Public Defender, San Rafael, California; for Amici Curiae California Public Defender's Association, Marin County Office of the Public Defender, Los Angeles County Office of the Public Defender, Santa Clara County Office of the Public Defender, Alameda County Office of the Public Defender, Contra Costa County Office of the Public Defender, Fresno County Office of the Public Defender, Ventura County Office of the Public Defender, Sonoma County Office of the Public Defender, and Yolo County Office of the Public Defender.

Charles Roth, National Immigrant Justice Center, Chicago, Illinois, for Amicus Curiae National Immigrant Justice Center.

Jerome Mayer-Cantú, Oakland, California, for Amici Curiae Law Professors and Clinicians.

Kari Hong, Ninth Circuit Appellate Project, Boston College Law School, Newton, Massachusetts, for Amicus Curiae Immigrant Legal Resource Center.

## ORDER

The opinion and concurring opinion filed July 10, 2020, and appearing at 965 F.3d 724 (9th Cir. 2020), are withdrawn. They may not be cited by or to this court or any district court of the Ninth Circuit.

A new opinion is filed simultaneously with the filing of this order, along with a concurring opinion. The petition for rehearing en banc is denied as moot. The parties may file petitions for rehearing and petitions for rehearing en banc in response to the new opinion, as allowed by the Federal Rules of Appellate Procedure.

## OPINION

IKUTA, Circuit Judge:

The petitioner here was convicted three times of petty theft under section 484(a) of the California Penal Code. The Board of Immigration Appeals (BIA) did not err in concluding these convictions involved moral turpitude. *See, e.g.*, *Castillo-Cruz v. Holder*, 581 F.3d 1154, 1160 (9th Cir. 2009). Therefore, the BIA did not abuse its discretion in holding that petitioner was removable for having committed two or more crimes involving moral turpitude. 8 U.S.C.

§ 1227(a)(2)(A)(ii).  We also hold that the BIA did not abuse its discretion in denying the petitioner's motion to reopen.

I

Joel Empleo Silva was admitted to the United States as a lawful permanent resident on June 27, 1996.  After admission, Silva was convicted of petty theft offenses under the California Penal Code on three separate occasions: in 1998, he was convicted of petty theft in violation of sections 484(a) and 490.5,[1] and in 2004 and 2007, he was convicted of petty theft with a prior theft conviction in violation of sections 484(a) and 666.[2]  Silva was also convicted of attempted theft in violation of section 664 in 2000.

In May 2015, the Department of Homeland Security charged Silva as removable for having been "convicted of two or more crimes involving moral turpitude," 8 U.S.C.

---

[1] Section 484(a) states, in pertinent part, "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another . . . is guilty of theft."  Cal. Pen. Code § 484(a).  Section 484(a) encompasses both petty and grand theft; the elements of petty theft are the same as grand theft, apart from the amount or type of property taken.  *See* Cal. Pen. Code §§ 487, 488; *United States v. Esparza-Ponce*, 193 F.3d 1133, 1137 (9th Cir. 1999).

Section 490.5 prescribes the punishment for a "first conviction for petty theft involving merchandise taken from a merchant's premises." Cal. Pen. Code § 490.5.  Silva was charged with stealing merchandise from a J. C. Penney department store.

[2] At all relevant times, section 666 allowed for heightened punishments of persons convicted of petty theft after having served time based on a prior petty theft conviction.  *See* Cal. Penal Code § 666 (effective Jan. 1, 2001 to Sep. 8, 2010).

§ 1227(a)(2)(A)(ii),[3] referencing Silva's three petty-theft offenses and his attempted-theft conviction. An immigration judge held that Silva was removable as charged.

In December 2015, the BIA dismissed Silva's appeal. It rejected Silva's argument that a violation of section 484(a) did not qualify as a crime involving moral turpitude for two reasons. First, it held that a violation of section 484(a) was categorically a crime involving moral turpitude because the Ninth Circuit had "repeatedly held that it is." (citing *Castillo-Cruz v. Holder*, 581 F.3d at 1160; *Flores Juarez v. Mukasey*, 530 F.3d 1020, 1022 (9th Cir. 2008) (per curiam); *United States v. Esparza-Ponce*, 193 F.3d 1133, 1136 (9th Cir. 1999)).

Second, the BIA held that a violation of section 484(a) was also a crime involving moral turpitude under BIA precedent. It rejected Silva's argument that under California law, a violation of section 484(a) did not require the accused to intend a literally permanent deprivation of the owner's property, while under BIA precedent, a theft involving moral turpitude required such an intent. The BIA held that this argument was based on a misinterpretation of earlier BIA decisions "holding that moral turpitude does not inhere in 'joyriding' and similar offenses" that did not constitute theft or larceny at common law. The BIA clarified that "moral turpitude necessarily inheres in offenses constituting theft or larceny as those terms were understood at common law," and

---

[3] Section 1227(a)(2)(A)(ii) provides, "Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial, is deportable." 8 U.S.C. § 1227(a)(2)(A)(ii).

common law larceny did not include an intent to cause a literally permanent deprivation of a person's property. Therefore, an "offender commits a [crime involving moral turpitude] whenever he takes the property of another with the intention of disposing of the property in a manner that permanently deprives the owner of its *value*; the baseness of such an offense is not mitigated by the offender's intention to return the property to the owner after its value has been vitiated." (emphasis added). Accordingly, the BIA reaffirmed that a violation of section 484(a) is a categorical crime involving moral turpitude.

The BIA expressed no opinion on Silva's further argument that the phrase "crimes involving moral turpitude" was unconstitutionally vague, holding that it lacked jurisdiction to declare an act of Congress unconstitutional.

Silva petitioned for review. While the petition was pending, Silva moved to reopen proceedings in light of changed country conditions in the Philippines, for the purpose of applying for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). In his motion, Silva made the following allegations. After Rodrigo Duterte was elected president of the Philippines, he instituted an anti-drug program that included an initiative called Oplan Tokhang—roughly translated as "knock and plead"—which focused on low-level sellers and users. Under Oplan Tokhang, police and local officials visited the houses of suspected drug sellers and users and demanded that they cooperate with the police. Suspects who did not cooperate, or who initially cooperated but then returned to using or selling, were reportedly killed.

Silva also alleged that his history of drug use would put him at risk if he returned to the Philippines. In a declaration submitted with his motion to reopen, Silva testified that he had regularly used methamphetamine while in the United States from the late 1990s until 2015 and that he had used a cheap form of the drug called "shabu" daily with friends and neighbors when he returned to the Philippines for three months in early 2000. After being taken into immigration custody in May 2015, Silva stopped using drugs and has continued to abstain from drug use after his release, even though he had "been tempted many times by [a] friend." Despite abstaining from drugs, Silva claims that if he returns to the Philippines, the people who knew him when he was there in 2000 could "rat him out" to the police as a former drug user. Further, Silva believes that "it will be very hard for [him] to resist the temptation to start using shabu" in the Philippines.

The BIA denied Silva's motion to reopen. The BIA reasoned that Silva had not shown that Filipino authorities were aware or would become aware of his past drug use. Nor had Silva shown that he would use drugs in the Philippines. Therefore, the BIA held that Silva had not made out a prima facie case for asylum, withholding of removal, or CAT protection. Silva petitioned for review.

We consolidated Silva's two pending petitions for review. *See* 8 U.S.C. § 1252(b)(6). We have jurisdiction over both petitions based on 8 U.S.C. § 1252(a)(1). *See Mata v. Lynch*, 576 U.S. 143, 147 (2015).[4]

---

[4] Silva stated that the criminal-alien bar, 8 U.S.C. § 1252(a)(2)(C), applies here. He is mistaken. The criminal-alien bar limits our jurisdiction "to review any final order of removal against an alien who is

II

We first turn to Silva's petition for review of the BIA's December 2015 order of removal. On appeal, Silva argues that he is not removable for having been convicted "of two or more crimes involving moral turpitude," 8 U.S.C. § 1227(a)(2)(A)(ii), because a violation of section 484(a) of the California Penal Code does not involve moral turpitude.

To determine whether an alien's crime of conviction subjects the alien to removal under 8 U.S.C. § 1227(a)(2)(A)(ii), we apply the categorical approach set forth in *Taylor v. United States*, 495 U.S. 575 (1990). *Marmolejo-Campos v. Holder*, 558 F.3d 903, 912 (9th Cir. 2009) (en banc). That approach requires us to determine "whether the crime of conviction contains all the elements of the generic federal offense." *Renteria-Morales v. Mukasey*, 551 F.3d 1076, 1081 (9th Cir. 2008).[5]

A

In making this determination, we begin by defining the elements of the generic federal offense, *id.*, in this case,

removable by reason of having committed" various criminal offenses, including certain crimes involving moral turpitude "for which a sentence of one year or longer may be imposed." 8 U.S.C. § 1227(a)(2)(A)(i)(II); *see* 8 U.S.C. § 1252(a)(2)(C). Because Silva's petty-theft convictions were not crimes for which such a sentence may be imposed, *see Rusz v. Ashcroft*, 376 F.3d 1182, 1185 (9th Cir. 2004), the criminal-alien bar is not applicable here.

[5] Neither party argues that we should apply the modified categorical approach here, *see, e.g.*, *Shepard v. United States*, 544 U.S. 13, 26 (2005), so we do not address that issue.

"crimes involving moral turpitude," 8 U.S.C. § 1227(a)(2)(A)(ii). We "defer to the BIA's articulation of the generic federal definition 'if the statute is silent'" and "the BIA's interpretation is 'based on a permissible construction of the statute.'" *Renteria-Morales*, 551 F.3d at 1081 (quoting *Parrilla v. Gonzales*, 414 F.3d 1038, 1041 (9th Cir. 2005)).

The BIA has defined the term "moral turpitude" as referring to conduct that is "inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general." *Matter of Silva-Trevino*, 26 I. & N. Dec. 826, 833 (BIA 2016) (citation omitted). The BIA has further explained that "[t]o involve moral turpitude, a crime requires two essential elements: reprehensible conduct and a culpable mental state." *Id.* at 834 (citing *Nino v. Holder*, 690 F.3d 691, 695 (5th Cir. 2012)). Although we have framed our definition of "moral turpitude" in slightly different terms,[6] it "does not differ materially from the [BIA's]." *Marmolejo-Campos*, 558 F.3d at 910 (citing *Galeana-Mendoza v. Gonzales*, 465 F.3d 1054, 1058 n.9 (9th Cir. 2006)). These definitions, however, are not helpful for our task of identifying the elements of a generic "crime involving moral turpitude" for purposes of the categorical approach, because they fail "to 'particularize' the term in any meaningful way." *Id.*

Given the difficulty of determining the elements of "crimes involving moral turpitude" as opposed to determining the elements of a specific criminal offense, the BIA has

---

[6] "[W]e have traditionally divided crimes involving moral turpitude into two basic types: 'those involving fraud and those involving grave acts of baseness or depravity.'" *Marmolejo-Campos*, 558 F.3d at 910 (quoting *Carty v. Ashcroft*, 395 F.3d 1081, 1083 (9th Cir. 2005)).

adopted a different approach. Because the phrase "crimes involving moral turpitude" refers to a category of crimes rather than a specific offense with identifiable elements, *cf.* 8 U.S.C. § 1101(a)(43), the BIA has sensibly moved from trying to define the phrase itself to instead giving examples of the types of offenses that qualify as "crimes involving moral turpitude," *see, e.g.*, *Matter of Diaz-Lizarraga*, 26 I. & N. Dec. 847, 847 (BIA 2016). We have deferred to this approach when articulated by the BIA in a published opinion. *See Marmolejo-Campos*, 558 F.3d at 910–11.

Using this method of interpretation, the BIA had determined that theft offenses involving moral turpitude are a subset of theft offenses defined more generally. The BIA has defined a generic theft offense for purposes of the statutory section providing that the term "aggravated felony" means, among other things, "a theft offense (including receipt of stolen property)," 8 U.S.C. § 1101(a)(43)(G). In this context, a "theft offense" is one that involves: "[1] taking of property or an exercise of control over property [2] without consent [3] with the criminal intent to deprive the owner of rights and benefits of ownership, even if such deprivation is less than total or permanent." *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 189 (2007) (quoting *Penuliar v. Gonzales*, 435 F.3d 961, 969 (9th Cir. 2006)).

The BIA's cases defining theft crimes involving moral turpitude, however, are more nuanced. In several cases from the 1940s, the BIA concluded that the offense of joyriding, which could be committed with the intent to deprive an owner of a car for a temporary period without intent to steal, did not involve moral turpitude. *Matter of D-*, 1 I. & N. Dec. 143, 145 (BIA 1941); *Matter of H-*, 2 I. & N. Dec. 864, 866 (BIA 1947); *see also Matter of P-*, 2 I. & N. Dec. 887, 887 (BIA

1947).  The BIA reasoned that only theft offenses which "by their nature necessarily constitute theft or stealing as those offenses are known at common law" would qualify, *Matter of D-*, 1 I. & N. Dec. at 145, and that "before the crime of theft or stealing is deemed one involving moral turpitude" an offense "must be one which involves a permanent taking as distinguished from a temporary one," *Matter of H-*, 2 I. & N. Dec. at 865.

Despite these joyriding cases, the BIA did not conclusively resolve whether theft offenses could involve moral turpitude even when a person did not intend a literally permanent deprivation of property.  *See Matter of Jurado-Delgado*, 24 I. & N. Dec. 29, 33 (BIA 2006).  In *Jurado-Delgado*, the petitioner argued that his offense of conviction, retail theft, was not a crime involving moral turpitude because "the statute does not require an intent to *permanently* deprive the owner of the use or benefit of the merchandise." *Id.*  The BIA stated it "need not decide whether the premise of the respondent's argument is correct, i.e., that if the offense required only an intent to temporarily deprive the owner of the use or benefit of the property taken, the crime would not be one of moral turpitude." *Id.*  Instead, the BIA held it was reasonable to assume that the taking was with the intention of retaining the merchandise permanently.  *Id.* at 33–34; *see also Matter of Grazley*, 14 I. & N. Dec. 330, 333 (BIA 1973) (treating a statute that did not require proof that a taking was permanent as divisible, and presuming that the accused intended the permanent taking of property).

Against this backdrop, *Matter of Diaz-Lizarraga* reexamined the elements of a theft offense involving moral turpitude.  26 I. & N. Dec. at 850.  In doing so, the BIA explained that a "careful examination" of its "early cases

reflects that [its] purpose in adopting the 'intent to permanently deprive' requirement was to distinguish between substantial and reprehensible deprivations of an owner's property on the one hand and, on the other, mere de minimis takings in which the owner's property rights are compromised little, if at all." *Id.* The BIA noted that its early decisions were aimed at excluding joyriding or other short-term and de minimis takings of property, *id.* at 853–54, and did not address other sorts of temporary takings, such as those that "appropriate[d] a major portion of [the property's] economic value," *id.* at 848, 851–52. Since its early decisions, the BIA observed, criminal law had evolved, and most jurisdictions had abandoned the "traditional dichotomy of permanent versus temporary takings." *Id.* at 851. Accordingly, the BIA updated its jurisprudence to reflect that of the majority of states and the Model Penal Code, and held that "a theft offense is a crime involving moral turpitude if it involves an intent to deprive the owner of his property either permanently or under circumstances where the owner's property rights are substantially eroded." *Id.* at 853. Under this definition, a theft offense may involve moral turpitude "despite the fact that it does not require the accused to intend a literally permanent taking." *Id.* at 852 (emphasis omitted). Further, the BIA stated that "to the extent that any of our prior decisions have required a literal intent to permanently deprive in order for a theft offense to be a crime involving moral turpitude, those decisions are overruled." *Id.* at 855.

The BIA recognized that its decisions in *Matter of Grazley* and *Matter of Jurado-Delgado* attempted to "finesse" the distinction between de minimis takings and "those more serious cases in which property is taken 'temporarily' but returned damaged or after its value or usefulness to the owner has been vitiated" by "indulging a commonsense

'assumption' that in cases involving a theft of cash or merchandise from a retail establishment, the offender's intent was to permanently deprive the owner of the cash or merchandise." *Id.* at 854 & n.11. The BIA approved the rulings in those cases, but noted that given the "strictures of the categorical approach" in recent Supreme Court cases, it was necessary to update the moral turpitude standard "to more accurately distill the state of the criminal law in this area." *Id.* at 854 n.11.

We subsequently concluded that *Matter of Diaz-Lizarraga*'s "decision to abandon the literally-permanent deprivation test was a rather abrupt change in the law." *Garcia-Martinez v. Sessions*, 886 F.3d 1291, 1295 (9th Cir. 2018). *Garcia-Martinez* acknowledged that the BIA had deviated from the permanent-deprivation test "from time to time," but held that "the BIA did not overturn the requirement that a taking must be literally permanent" until it decided *Matter of Diaz-Lizarraga*. *Id.*

Having reached this conclusion, *Garcia-Martinez* asked whether the retroactive application of *Diaz-Lizarraga* made a difference to the petitioner in that case. *Garcia-Martinez* concluded that, because the petitioner's crime of conviction under Oregon law included temporary takings, it would not have qualified as a theft offense involving moral turpitude but for *Diaz-Lizarraga*'s new rule, *id.* at 1295–96. As a result, "[i]f the new rule [did] not apply retroactively, the BIA's decision in [that] case was in error." *Id.* at 1294 & n.4.

Because the BIA's ruling could not stand unless the agency's new rule applied retroactively, *Garcia-Martinez* turned to the retroactivity question. In order to determine whether *Diaz-Lizarraga* could be applied retroactively to the

petitioner in that case, *Garcia-Martinez* had to apply our five-factor test for determining when rules promulgated through agency adjudication are retroactive. *See Montgomery Ward & Co., Inc. v. FTC*, 691 F.2d 1322 (9th Cir. 1982); *see also Miguel-Miguel v. Gonzales*, 500 F.3d 941, 951 (9th Cir. 2007). This test must be applied individually to the petitioner at issue. "In every case in which we have applied the *Montgomery Ward* test, we have done so on a case-by-case basis, for example, by analyzing whether a petitioner *actually* relied on a past rule, or by concluding that retroactivity *as applied* is impermissible." *Garfias-Rodriguez v. Holder*, 702 F.3d 504, 519 (9th Cir. 2012) (en banc).

Applying the *Montgomery Ward* test, *Garcia-Martinez* held that the new rule announced in *Matter of Diaz-Lizarraga* did not apply to the petitioner in the case before it, in part because we presumed that the petitioner would have relied on the BIA's prior rule that temporary takings did not constitute thefts involving moral turpitude. 886 F.3d at 1295–96. No Ninth Circuit case or Oregon state court decision affected the analysis of whether petitioner's reliance on the BIA's pre-*Diaz-Lizarraga* case law was reasonable. *Cf. Acosta-Olivarria v. Lynch*, 799 F.3d 1271, 1276 (9th Cir. 2015) (holding, for purposes of the *Montgomery Ward* test, that the petitioner had reasonably relied on a Ninth Circuit decision that was in tension with a prior BIA decision).

B

Following *Garcia-Martinez*'s lead, we first consider whether the BIA's decision in this case—that petitioner's conviction of a section 484(a) offense is a theft offense involving moral turpitude—would be correct even if the new rule in *Matter of Diaz-Lizarraga* did not apply retroactively

to this petitioner. In order to make such a determination, we must determine whether section 484(a) was a theft offense involving moral turpitude under our law as it existed before *Matter of Diaz-Lizarraga*.

Section 484(a) of the California Penal Code provides, in pertinent part, "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another . . . is guilty of theft." Cal. Pen. Code § 484(a). In 1993, a California appellate court held that "[a] person who intends only to temporarily deprive an owner of property, albeit while acquiring or depriving the owner of the main value of the property, does not intend to permanently deprive the owner of the property and therefore does not have the intent to commit theft, as that crime is defined under California law." *People v. Marquez*, 16 Cal. App. 4th 115, 123 (1993) (emphasis omitted).

The California Supreme Court subsequently cast doubt on this statement of law. *See People v. Davis*, 19 Cal. 4th 301, 318 (1998). In *Davis*, the California Supreme Court explained in dicta that section 484(a) includes the intent to "deprive the owner permanently of possession of the property," but "[t]he word 'permanently,' as used here is not to be taken literally," *id.* at 307 (citation omitted), and temporary takings could amount to theft in some circumstances, *id.* at 307 & n.4. In support, *Davis* explained that section 484(a) "is declaratory of the common law," *id.* at 304 n.1, and cited cases where defendants were convicted of larceny even though they did not intend a literally permanent deprivation, *id.* at 308–15.

After *Davis*, we held that a conviction under section 484(a) for petty theft qualified as a crime involving moral

turpitude.  *See Esparza-Ponce*, 193 F.3d at 1136–37. *Esparza-Ponce* explained that the BIA had already held that "petty larceny is a crime involving moral turpitude."  *Id.* at 1136.

An appellate court subsequently applied *Davis*'s dicta and held that "an intent by one to do less than retain property permanently will constitute theft when the owner's property was dealt with in such a way that there was a substantial risk of permanent loss."  *People v. Zangari*, 89 Cal. App. 4th 1436, 1447 (2001).

In 2002, the California Supreme Court resolved the tension between *Marquez* and *Zangari* by adopting the dicta in *Davis.  See People v. Avery*, 27 Cal. 4th 49, 55 (2002). *Avery* held that for purposes of section 484(a), "the intent to deprive the owner of property only temporarily, but for so extended a period of time as to deprive the owner of a major portion of its value or enjoyment, satisf[ies] the California requirement of intent to deprive the owner of the property permanently."  *Id.* at 54–55.  As in *Davis*, the California Supreme Court explained that this was the intent required to commit larceny at common law.  *Id.* at 58.  In short, a person could be convicted under section 484(a) even if that person did not intend to effect a literally permanent taking of property.  *Id*. at 55.

After *Avery* was decided, we continued to rely on *Esparza-Ponce.  See Castillo-Cruz*, 581 F.3d at 1159; *Flores Juarez*, 530 F.3d at 1022.  In *Flores Juarez*, decided six years after *Avery*, the petitioner was "convicted of three separate petty theft offenses in violation of California Penal Code §§ 484 and 488."  530 F.3d at 1022.  Without mentioning *Avery*, we relied on *Esparza-Ponce* to conclude that "[p]etty

theft is a crime involving moral turpitude." *Id*. And in *Castillo-Cruz*, decided seven years after *Avery*, we stated that petty theft in violation of section 484(a) was a crime involving moral turpitude because it required "the specific intent to deprive the victim of his property permanently." 581 F.3d at 1160 (citation omitted). Thus, we have consistently held that a conviction under section 484(a) is a crime involving moral turpitude, and the BIA has never held to the contrary, despite making changes to its generic definition of a theft offense. *See, e.g.*, *In re Kochlani*, 24 I. & N. Dec. 128, 129 (BIA 2007) ("[T]here is no dispute that the California offense of grand theft is a crime involving moral turpitude." (citing *Esparza-Ponce*, 193 F.3d at 1136–37)); *In re Kotliar*, 24 I. & N. Dec. 124, 125 (BIA 2007) (similar).

In analyzing a theft offense under section 484(a), *Esparza-Ponce*, *Flores Juarez*, and *Castillo-Cruz* failed to consider the difference between the intent requirement in section 484(a) and the BIA's articulation of the intent required for a theft offense involving moral turpitude before *Matter of Diaz-Lizarraga*. In other words, our cases did not acknowledge that section 484(a) did not necessarily require an intent to take property permanently, and therefore that such an offense would not be a theft offense involving moral turpitude for immigration purposes before *Diaz-Lizarraga* was decided.

But we are nevertheless bound by our precedent. "[T]he first panel to consider an issue sets the law not only for all the inferior courts in the circuit, but also future panels of the court of appeals." *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001). In our circuit, a three-judge panel must apply binding precedent even when it is clearly wrong because (for example) it failed to recognize an intervening change in the

law. *See United States v. Contreras*, 593 F.3d 1135, 1136 (9th Cir. 2010) (en banc) (holding that a three-judge panel lacked authority to overrule decisions that failed to recognize an intervening amendment to a sentencing guideline). Only an en banc court has the power to fix these errors. *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1189 (9th Cir. 2011). A three-judge panel can reconsider the law of the circuit only when "the relevant court of last resort" has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable," *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir.2003) (en banc), or when a three-judge panel must follow an agency construction entitled to *Chevron* deference rather than a prior judicial interpretation of an ambiguous statute, *see Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).

Because *Avery* predates *Castillo-Cruz* and *Flores Juarez*, there is no "intervening decision on controlling state law by a state court of last resort," *Gammie*, 335 F.3d at 893, and we are "bound to reach the same result" as our precedent, *Massanari*, 266 F.3d at 1170. Accordingly, we must hold that the BIA did not err in concluding that Silva was removable on the ground that he was "convicted of two or more crimes involving moral turpitude," 8 U.S.C. § 1227(a)(2)(A)(ii), regardless whether *Diaz-Lizarraga* applies retroactively to Silva.[7]

---

[7] Silva's argument that the phrase "crimes involving moral turpitude" is unconstitutionally vague is foreclosed by our recent opinion in *Martinez-de Ryan v. Whitaker*, 909 F.3d 247, 251–52 (9th Cir. 2018), *cert. denied sub nom. Martinez-de Ryan v. Barr*, 140 S. Ct. 134 (2019). Although Silva purports to raise a new argument regarding why the phrase is void for vagueness, we are bound by prior circuit law even when a new litigant raises arguments that are "characterized differently or more

Because we conclude that, based on our binding precedent, a violation of section 484(a) constitutes a crime involving moral turpitude, we need not address the question whether *Matter of Diaz-Lizarraga* is retroactively applicable in this case and need not apply the *Montgomery Ward* test to answer that question. *See Garcia-Martinez*, 886 F.3d at 1295–96.

## III

We next turn to the BIA's denial of Silva's motion to reopen. Although Silva did not seek relief from removal at his initial hearing, an alien may move to reopen proceedings for the purpose of submitting new applications for relief. *See* 8 U.S.C. § 1229a(c)(7); 8 C.F.R. § 1003.2(c)(1). We review the denial of a motion to reopen for an abuse of discretion and reverse only if the BIA's decision was "arbitrary, irrational, or contrary to law." *Valeriano v. Gonzales*, 474 F.3d 669, 672 (9th Cir. 2007) (citation omitted).

Where, as here, the motion to reopen is based on changed circumstances in the country to which removal has been ordered, the movant must: (1) produce evidence that conditions have changed in the country of removal, (2) demonstrate that the evidence is material, (3) show that the evidence was not available and would not have been discovered or presented at the previous hearing, and (4) demonstrate that the new evidence, when considered together with the evidence presented at the original hearing, would establish prima facie eligibility for the relief sought.

persuasively." *United States v. Ramos-Medina*, 706 F.3d 932, 939 (9th Cir. 2013).

*See* 8 U.S.C. 1229a(c)(7)(ii); 8 C.F.R. § 1003.2(c)(1); *Agonafer v. Sessions*, 859 F.3d 1198, 1204 (9th Cir. 2017).**[8]**

Here, the BIA denied the motion to reopen on the ground that Silva had not established the fourth prong: that the new evidence would establish a prima facie case for the relief sought. Therefore, our review is limited to that ground. *See Navas v. INS*, 217 F.3d 646, 658 n.16 (9th Cir. 2000). To establish a prima facie case, the movant must adduce evidence that, along with the facts already in the record, "will support the desired finding if evidence to the contrary is disregarded." *Maroufi v. INS*, 772 F.2d 597, 599 (9th Cir. 1985); *see also Sakhavat v. INS*, 796 F.2d 1201, 1204 (9th Cir. 1986) (stating that, at the motion-to-reopen stage, the BIA must determine whether the movant's affidavits "on their face cumulatively establish a clear probability" that he is entitled to the relief sought). The BIA may not make credibility determinations on motions to reopen, *Yang v. Lynch*, 822 F.3d 504, 509 (9th Cir. 2016), and "must accept as true the facts asserted by the [movant], unless they are 'inherently unbelievable,'" *Agonafer*, 859 F.3d at 1203

---

**[8]** Section 1229a(c)(7) provides, "There is no time limit on the filing of a motion to reopen if the basis of the motion is to apply for relief under sections 1158 [asylum] or 1231(b)(3) [withholding of removal] of this title and is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding." 8 U.S.C. § 1229a(c)(7)(ii) (footnote omitted). The regulations governing such motions appear at 8 C.F.R. § 1003.2. We have held that these regulations also apply to claims under the Convention Against Torture. *Go v. Holder*, 744 F.3d 604, 609 (9th Cir. 2014).

(quoting *Limsico v. INS*, 951 F.2d 210, 213 (9th Cir. 1991)).[9] Nevertheless, "[c]ourts have recognized that a prima facie case of the clear probability of persecution cannot be established from speculative conclusions or vague assertions." *Maroufi*, 772 F.2d at 599; *see also Nagoulko v. INS*, 333 F.3d 1012, 1018 (9th Cir. 2003) (holding that an alien's fear of a hostile political party regaining power in her country is "too speculative to be credited as a basis for fear of future persecution" absent "specific evidence" suggesting that such an event will occur). Therefore, "[a]ffidavits submitted in support of motions to reopen deportation proceedings must contain specific facts in order to carry the burden of establishing a clear probability of persecution." *Maroufi*, 772 F.2d at 600.

We turn to the question whether Silva established a prima facie case for asylum or withholding of removal. Silva does not contend that he suffered past persecution in the Philippines, so to qualify for asylum he must demonstrate "a well-founded fear of future persecution" in the Philippines, 8 C.F.R. § 1208.13(b), "on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42). In the absence of past persecution, an applicant must prove both a subjective fear of future persecution, 8 C.F.R. § 1208.13(b)(2)(i)(A), and an objectively "reasonable possibility" of future persecution, 8 C.F.R. § 1208.13(b)(2)(i)(B). "The objective component requires a showing, by credible, direct, and specific evidence in the record, of facts that would support a reasonable fear of persecution." *Limsico*, 951 F.2d at 212 (citation omitted).

---

[9] "[W]here some of the evidence is developed at a hearing, the [BIA] is of course free to interpret that evidence free from inferences in favor of the moving party." *Limsico*, 951 F.2d at 213 (citation omitted).

"Speculation on what could occur is not enough to establish a reasonable fear." *Bartolome v. Sessions*, 904 F.3d 803, 814 (9th Cir. 2018).

Section 1231(b)(3) provides for withholding of removal. 8 U.S.C. § 1231(b)(3). To qualify for this form of relief, the applicant must demonstrate that it is "more likely than not that he or she would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion upon removal to [the country in question]." 8 C.F.R. § 1208.16(b)(2). The "more likely than not" standard for withholding of removal is "more stringent" than the "reasonable possibility" standard for asylum, and therefore an applicant who is unable to show a "reasonable possibility" of future persecution "necessarily fails to satisfy the more stringent standard for withholding of removal." *Mansour v. Ashcroft*, 390 F.3d 667, 673 (9th Cir. 2004); *accord Duran-Rodriguez v. Barr*, 918 F.3d 1025, 1029 (9th Cir. 2019).

Here, the BIA did not abuse its discretion in concluding that Silva failed to establish a prima facie case for asylum or withholding of removal. In his declaration, Silva speculated that someone in the Philippines could report his past drug use to the government, or that he might succumb to the temptation to begin using drugs again. Silva did not, however, submit any "specific evidence" that such events might occur, and these possibilities are "too speculative to be credited as a basis for fear of future persecution." *Nagoulko*, 333 F.3d at 1018. Accordingly, the BIA did not abuse its discretion in concluding that Silva failed to establish a prima facie case for asylum. Therefore, he also "necessarily fail[ed] to satisfy the more stringent standard for withholding of removal." *Mansour*, 390 F.3d at 673.

We next turn to the question whether Silva established a prima facie case for protection under the Convention Against Torture (CAT). To qualify for CAT protection, the applicant must "establish that it is more likely than not that he or she would be tortured if removed to [the country in question]." 8 C.F.R. § 1208.16(c)(2); *accord Duran-Rodriguez*, 918 F.3d at 1029.

It was neither arbitrary nor irrational for the BIA to conclude that Silva's speculations in his motion to reopen and declaration were insufficient to show "that it is more likely than not that he would be tortured if removed to [the Philippines]." *Duran-Rodriguez*, 918 F.3d at 1029 (citing 8 C.F.R. § 1208.16(c)(2)); *see Delgado-Ortiz v. Holder*, 600 F.3d 1148, 1152 (9th Cir. 2010) (holding that generalized evidence of crime in Mexico was insufficient to establish prima facie eligibility for CAT protection). Therefore, the BIA did not abuse its discretion in concluding that Silva failed to establish a prima facie case for CAT protection.

**PETITIONS DENIED**.

BERZON, Circuit Judge, concurring:

I concur in the majority opinion in full. I write separately to reiterate yet again my view that the phrase "crime involving moral turpitude" is unconstitutionally vague. *See Barbosa v. Barr*, 926 F.3d 1053, 1060–61 (9th Cir. 2019) (Berzon, J., concurring); *Jauregui-Cardenas v. Barr*, 946 F.3d 1116, 1121 (9th Cir. 2020) (Berzon, J., concurring). The majority opinion provides yet another example of our "failed enterprise" to consistently determine whether a crime

involves moral turpitude when there is no "coherent criteria" as to what that phrase encompasses. *Islas-Veloz v. Whitaker*, 914 F.3d 1249, 1258–61 (9th Cir. 2019) (Fletcher, J., concurring). As "persistent efforts" have failed "to establish a standard" of what a "crime involving moral turpitude" is, it is time to revisit whether this phrase is unconstitutionally vague. *See Johnson v. United States*, —U.S.—, 135 S. Ct. 2551, 2558 (2015) (internal citation and quotation marks omitted).